**RAY T. WHITFIELD, Petitioner**

v.

**INTERNATIONAL MOTORS CORPORATION, Respondent**

Civil No. 531/1988

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

April 14, 1989

RICHARD R. KNOEPFEL, ESQ. (BRIGGS, KNOEPFEL & RONCA), St. Thomas, V.I., *for petitioner*

KEVIN F. D'AMOUR, ESQ. (PALMER & D'AMOUR), St. Thomas, V.I., *for respondent*

CHRISTIAN, *Senior Sitting Judge*

## MEMORANDUM OPINION

### I. INTRODUCTION

This matter is before the court on motion of petitioner for summary judgment of avoidance or reformation of the contract entered into by the parties on January 27, 1983, to correct a mutual mistake made in reducing the contract of the parties to writing; and on motion of the respondent for summary judgment requiring performance of the contract as written. The motion of the petitioner for reformation of the contract will be granted. The motion of the respondent for performance of the contract as written will be denied.

### II. FACTUAL BACKGROUND

On July 11, 1968, the Government of the Virgin Islands, acting by and through its instrumentality, the Airport and Industrial Resources Agency (hereafter "the Agency" or "the Lessor"), leased Parcels Nos. SB-9 and SB-70 Submarine Base, St. Thomas, Virgin Islands, to Ray Whitfield, (hereafter "petitioner"), for a period of twenty (20) years, commencing July 11, 1968, as per sections 1 and 33 thereof, with two five-year options to renew, "subject to renegotiation of the annual rental to be paid for the renewal period[s], based on any increase in ground rentals for comparably situated lots, of the same size, more or less, in like areas; and provided further, however, that such renegotiation shall not result in an increase in the annual rental in excess of 33 1/3 percent of that provided herein." The ground rent payable was fixed at $1,282.80 per year, based on $0.12 per square foot to be paid in twelve equal monthly installments, renegotiable every five years, but in no instance with an increase of more than 5% over and above the original base rental.

Within twenty-four months after the lease commenced, petitioner was also required to make capital improvements on the demised premises having a fair market value of at least $35,000.00, which, subject to conditions beyond his control, were to be started not later than ninety (90) days after the commencement of the primary lease

term. There is no question involved as to petitioner's compliance with this requirement.

On April 21, 1971, petitioner sublet the premises to Consolidated Parts, Inc. (hereafter "Consolidated"), for a period of fifteen (15) years. A term rent of $289,250.00 payable in equal monthly installments of $1,606.90 was agreed to by the parties.

On January 21, 1973, Consolidated sublet the premises to International Motors Corporation (hereafter "respondent"), for the period commencing January 21, 1973, and ending February 27, 1986, at a monthly rental of $1,606.90. However, at or about the time of the execution of this agreement, Consolidated in effect dropped out of any negotiations relating to the premises; the parties to this action dealt directly with each other just as if the contract entered into between Consolidated and respondent was an assignment instead of a sublease.

On January 27, 1983, the parties hereto, continuing to deal directly with each other, and to the total exclusion of Consolidated, entered into an amendment, which, in effect, amended both the sublease dated April 21, 1971, between Petitioner and Consolidated, and the sublease dated January 21, 1973, entered into between Consolidated and Respondent.

In the 1983 amendment, the parties:

(a) raised the monthly rent from $1,606.90 to $2,106.90 retroactive to October 1, 1982, and continuing through April 30, 1986. (See Paragraph (1) of the amendment.)

(b) lengthened the term of respondent's sublease to end on July 31, 1988, instead of April 30, 1986, so as to make its end coterminal with that of the master lease between petitioner and the Agency. (See paragraph (2) id.)

(c) In addition to the retroactive increase mentioned in (a) above, further increased the rent for the period from May 1, 1986, to July 31, 1988, from $2,106.90 to $2,700.00 per month. (See Paragraph (2) id.)

(d) Made respondent responsible, from October 1, 1982, for "all maintenance of each and every kind, nature or description to the building and the property covered by the Primary Lease and Subleases." (See Paragraph (3) id.)

(e) Provided that "Notwithstanding any provisions in the Sublease Agreements to the contrary, from and after October 1, 1982, all increases in amounts to be paid by Lessor Whitfield to the Government of the Virgin Islands pursuant to the Primary Lease,

153

of whatsoever kind or nature, including but not limited to rentals, taxes and other assessments, shall be for the account of Lessee International and upon demand by the Government for payment to Lessor Whitfield herein and notification thereof by Whitfield to International, International shall promptly pay said sums to Lessor Whitfield." (See Paragraph (4) id.)

(f) Provided that "The parties understand and agree that from and after October 1, 1982, the Agreement between them shall, notwithstanding and prior provisions or covenants to the contrary, be considered as a "net lease" arrangement to Whitfield; that there will be no obligations on his part to maintain the premises and thereafter all maintenance and upkeep expenses shall be for the account of International Motors Corporation." (See Paragraph (5) id.)

(g) Provided that "[w]hereas the Agreements between these parties to which these amendments pertain do not provide for the exercising of renewal options (as in the Primary Lease so contained) it is the agreement herein that Ray Whitfield, his heirs or assigns, will elect to exercise his option rights with the Government of the Virgin Islands (as in the Primary Lease so provided). In that event Lessee International shall also have the option to renew the Sublease Agreement for two successive option periods of five (5) years each; provided always, that such extension of the Sublease shall be consistent with the requirements set forth in the Primary Lease. In the event Lessee International elects to exercise such option or options, then and in that event the monthly rental installments, taxes and insurance shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the regular term of the Sublease Agreements. In the event that the second option period is exercised by International, then the rentals, taxes and insurance for said period shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the first five (5) year option period. In all other instances the terms and conditions of the Sublease Agreements (and the modifications herein agreed to by the parties) shall apply to the two option periods." [Underscoring ours.] (See Paragraph (6) id.)

(h) Finally, in Paragraph (7) of the January 27, 1983, amendment, the parties provided that "[o]ther than the provisions herein contained, all terms, conditions, and agreements made between these parties in the Sublease Agreements of April 21, 1971, and

January 21, 1973, shall continue and each party so ratifies them at this time." (See Paragraph (7) id.)

It is the contractual effect to be given by the Court to the underscored portion of Paragraph (6) of this amendment to the Lease which has given rise to this lawsuit between the parties. There is no question of the need of interpretation of the language in question as both parties say, and the Court concurs, that that language is clear and unambiguous; that therefore there is no material issue of fact to be tried by the Court; and, therefore, each party prays the Court to enter Summary Judgment in its behalf.

From the predecessor subleases between petitioner and Consolidated, dated April 21, 1971, and from Consolidated to respondent, dated January 21, 1973, treated as heretofore noted as an assignment so that thereafter Consolidated negotiated no further in the lease transactions, and the parties to this action dealt directly with each other, all the undertakings which may be deemed added burdens falling on the shoulder of the respondent listed in the 1983 amendment, except the two increases in rent which related to the extension of the original term of the lease and did not extend into the option periods in question here, were already the obligations of Respondent.[1] The history of the conduct of all entities or persons dealing with the leases negotiated for the demised premises, who were entitled to charge rent, including the Agency, petitioner, and Consolidated, and of those obligated to pay rents charged, from the

---

[1] See sections 4, 10, 11, 12 and 27 of Sublease between petitioner and Consolidated dated April 21, 1971. See also correlative Sections 4, 10, 11, 12 and 27 of sub-sublease (treated as an assignment) between Consolidated and Respondent, dated January 21, 1973. The 1983 amendment did not impose these or any other additional burdens on Respondent as it would have the Court believe was the quid pro quo for the decrease in the rent granted it in the January 1983 amendment if the options were exercised by it. All the amendment did was to reiterate these responsibilities previously undertaken by respondent, and which therefore were already its duty to perform if it elected to exercise the option(s). True, it was its predecessor in interest in the 1971 document, Consolidated, that first undertook to perform these obligations, but in that instance respondent stepped into the shoes of Consolidated when it signed the 1973 sublease (in fact assignment) from Consolidated, ten years before the 1983 amendment with the disputed provision was executed, and directly undertook from as far back as then to perform these obligations. It should be crystal clear, then, that the only new obligation which respondent would be obligated to perform if it exercised the option(s) was to pay some increase in the rent. After the unvarying history, the consistent course of dealing of the parties in this respect, how could any reasonable mind conclude that the agreement in 1983 was that petitioner would grant respondent the right to exercise these options, and receive no additional

very beginning, 1968, to the instant transaction consummated in January of 1983, has consistently, without a single exception, been one of increase of rent.[2]

When the primary term of the lease ended in July, 1988, and the first five-year option became operative, beginning August 1, 1988, for the first time the instant dispute arose. Petitioner claims that while the wording of Paragraph (6) of the January 1983 amendment was intended to read that the rent to be charged was in accord with the prior course of dealing of the parties, an increase, not exceeding 80% above the rent charged on July 31, 1988, but instead read a decrease of 20% of the rent charged on July 31, 1988, this wording was due to a mistake made by the petitioner's attorney in drafting the amendment; that it should have read that the rent shall be increased not more than 80% of the rent charged on July 31, 1988. The attorney in question filed his affidavit to the effect that petitioner's contention that a mistake was made is in fact correct. The affidavit in pertinent part reads:

> In November, 1982, after Mr. Whitfield had left St. Thomas and was living in the State of Florida, he contacted my office and requested that I draft an amendment to the 1971 sublease agreement which amendment would be between International Motors Corporation and him and would provide for the increase in rentals between the parties, the passing on to International Motors Corp. of any increase of rentals or taxes imposed by the Port Authority, provisions of two options of renewal of the sublease, and for the cost of maintenance of the building by the tenant. He instructed that the agreement contain provisions, in connection with the renewal options, which renewal options were for the benefit of International Motors Corp., that the increase in rentals, taxes and insurance would not increase rentals during the first renewal period by more than 80% of

consideration in exchange therefor, but would instead be subject to a twenty percent decrease in rent in each of the two five-year option periods? We hold that this was not the intention of the parties.

[2] (a) The rent charged on July 11, 1968, was $1,282.80 per year for ground rent.

(b) On April 21, 1971, the rent was increased to $1,606.90 per month for land and improvements.

(c) On January 27, 1983, the monthly rental was increased from $1,606.90 to $2,106.90, retroactive to October 1, 1982, and continuing through April 30, 1986.

(d) On January 27, 1983, the monthly rent was increased from 2,106.90 to 2,700.00 effective May 1, 1986, and continuing through July 31, 1988, the end of the Primary Lease term of twenty years.

the July, 1988 monthly rental; and that the increase during the second renewal term would not be more than 80% of the rentals during the first renewal period. Attached hereto as Exhibit "A" is a true and accurate copy of a file memo typed by my former legal secretary, Wilma Hart, which embodies the terms communicated to my office by Mr. Whitfield to be incorporated in my drafting of the amendment document.

I have had an opportunity to review my file in this matter. Among the papers contained within the file, aside from Exhibit "A", I have located notes prepared by me during the negotiations that took place, and, in particular, a rough draft of the amendment document I have hand-written, as well as other memos prepared at the time the Amendment to Lease Agreement was being negotiated. All of the said papers contained therein refer to increasing rents throughout the term of the lease, as well as the additional periods covered by the options. A true and accurate copy of my hand-written draft is attached hereto as Exhibit "B".

A true and accurate copy of the transmittal letter delivered to Emile Dupont and the typed, executed Amendment to Lease Agreement are attached hereto as Exhibits "C" and "D", respectively.

It is now apparent that an omission of words from paragraph 6 of the January 27, 1982, (sic, should have been 1983) agreement has distorted the true intent of the parties and their counsel at the time of the drafting and execution of the Amendment. It was my intent and the intent of the parties executing the document that the phrase contained in the last sentence at the bottom of page 2 should read "... then and in that event the increase in the monthly rental installments ...." The omission of those words was a typographical error and, as my client was in Florida and I was in St. Thomas, the error obviously was not caught.

There is absolutely no doubt in my mind that it was not the intention of any of the parties to that agreement, or of their counsel, that rentals during the two future option periods should be reduced to 80% of the previous rental. The understanding and intent was that any and all increases in rentals could not exceed 80% of existing rentals. [Underscoring ours.]

The attorney further supports his affidavit by attaching an in-house office memo of the attorney's legal secretary, Wilma Hart, indicating that in fact the information received by the clerk from Petitioner as to the agreement on this part of the January 1983 contract reached by the parties, and thus entitled to be integrated in the executed amendment, proves beyond doubt that the attorney made a mistake in drafting this part of the agreement of the parties. The Memorandum in question reads as follows:

Exhibit "A" November 12, 1982 9:35 a.m.
RLC:
Ray Whitfield called this morning. Left some info which should be included in the papers you are to be drafting.

He talked about some addendum to the lease. From the copies sent to you from International Motors no addendum seems to be attached.

The new lease should be from October 1, 1982 to April 30, 1986 with an increase in rent of $500—ignore the provision about the separate check.

From May 1, 1986 rental to be $2,700

Any increase on the rent from the Government and any new taxes will be paid by International Motors

With respect to the 5 year option as spelled out in the addendum after International Motors add E. Dupont will sign personally as well as John C. Cordier.

Section C item 2 paragraph 3 add "tenant shall be responsible for maintaining building and property."

Section 3 item 5 paragraph 5 after sentence "but shall in no event increase over the monthly rental for July 1988" add "plus all taxes, insurance and maintenance and the rental will not increase more than 80% for the first 5 years—on the second 5 years the rental will not increase over 80% of the first 5 years."

Whitfield said when lease was made with Port Authority it did not include his heirs. Should this not have been included so that his heirs can continue on should something happen to him.

wh [for Wilma Hart, the scrivener's legal secretary].

Conversely, the respondent contends that notwithstanding the past history of rent increases over the ensuing twenty years (1968–

1988), detailed in footnote 2 hereof, the parties intended exactly what the written words import, with the effect that the rent for the first five-year option, 1988–1993, if exercised, would decrease 20 percent; and further, in 1993, if the second five-year option were exercised, the rent would again decrease by 20% less than the rent payable on July 31, 1993. The effect of the rent payable issue is that the parties are $162,000.00 apart for the first five-year period, assuming the 80% increase v. 20% decrease is made effective during the first five-year option period, now extant, from August 1, 1988, obviously a not inconsiderable sum.

Petitioner prays the Court to either adjudge avoidance of the disputed amendment executed by the parties on January 27, 1983, pursuant to Restatement of Contracts, Second, section 152, or to adjudge reformation of the contract to read as Attorney Roger L. Campbell, the petitioner's counsel who drafted the agreement, says in his uncontroverted affidavit of February 13, 1989, it should read, based on the instruction received from petitioner by Mr. Campbell's legal secretary, which is reprinted above in haec verba, pursuant to section 155 id.[3]

Conversely, respondent prays the Court to adjudge that the agreement be enforced precisely as written, first, because the terms of the section in question are clear and unambiguous, and respondent is entitled to the benefits of the contract as a matter of law; second, that petitioner bears the risk of mistake, and therefore the contract is enforceable as written; third, that the amended lease is an integrated agreement and the Court cannot consider parol evidence; and, fourth, that if the contract clause is found to be unconscionable, reliance by respondent makes enforcement of the original contract (meaning the contract as written with the alleged mistake) proper.

Both parties pray the Court for summary judgment, contend that this is appropriate as there are no disputed material questions of fact, and they are each therefore entitled to summary judgment as a matter of law. 5 V.I.C. App. I, Rule 56.

Since neither the provisions of the 1983 amendment in question nor the statement of the scrivener that he made a mistake in writing same as he did, nor any other material statement of fact is

---

[3] The provisions of the Restatements are the rule of law of the district where not in conflict with local law. 1 V.I.C. § 4.

in issue, and both parties acknowledge this,[4] the case is ripe for summary judgment. Fed. R. Civ. P. 56.

## III. DISCUSSION

We begin our discussion by recalling and bringing into focus the legal principles, mostly if not entirely of an equitable nature, that we must bear in mind and follow in deciding the issue before us.

█ Since the respondent has not denied that Attorney Campbell, the scrivener, did make a mistake relating to a very crucial term in drafting the document signed by the parties, the Court takes the position, and finds, that the mistake was not that of one party only, but was a mutual mistake, and we therefore restrict our citations to those which are relevant to that part of the law.[5]

In the Introductory Note, in Chapter 6 of the Restatement of Contracts, Second, under the heading MISTAKE, we find the following statements, which we deem to be most applicable in reaching a just and fair decision in the case:

1. In general, the appropriate relief for mistake takes the form of avoidance of the contract. Where, however, because of a mistake of both parties as to expression the writing fails to express an agreement that they have reached previously, the appropriate relief ordinarily takes the form of reformation of the writing to make it conform to their intention. P. 379 id.
2. Avoidance is not an appropriate remedy where the mistake can be corrected by reformation. Under the rule stated in Section 214(d), the parol evidence rule does not prevent reformation in such a case, and under the rule stated in

---

[4] See last lines on page 4 in the Memorandum of Law submitted by both petitioner and respondent in support of their motion for summary judgment.

[5] On page 2 of respondent's brief, we read that: at no time was International Motors aware that a "mistake" or omission had been made in drafting of the amended Sublease; and in the affidavit of its principal stockholder at the time of the transaction. Temple Allen, dated March 9, 1989, he would go as far as stating in 8 thereof that his attorney reviewed the document and told him it in fact did call for a 20% decrease instead of a maximum increase of 80% of the rent in existence at the end of the primary term, and in paragraph 10, that at no time did he believe that the contract meant other than that which was expressed. But Mr. Allen did not come straight out and deny the statement made under oath by Attorney Campbell, that a mistake was made by him in drafting the document, and this mistake found its way into the document signed by the parties. Thus no material issue of fact arises here either, making summary judgment inappropriate, to which both parties to the action agree. (See Fed. R. Civ. P. 56(e).)

Section 156, the Statute of Frauds does not prevent reformation. However, since reformation is a discretionary equitable remedy, the rule stated in Section 155 tells only when a court "may" grant such relief, leaving open the possibility that it might deny it on equitable grounds. P. 381 id.

3. The rules governing all of the situations dealt with in this Chapter have traditionally been marked by flexibility and have conferred considerable discretion on the court. In part, this has been due to the protean character of the situations involved and the circumstance that they are almost inevitably unforeseen by the parties. In part it has been due to the fact that the law of mistake was shaped largely by courts of equity which had broad discretionary powers. This characteristic of flexibility marks the rules stated in this Chapter, as is evidenced by such necessarily imprecise language as "materially" (Section 152), "unconscionable" (Section 153), and "bears the risk" (Sections 152, 153, 154). In addition, Section 158 makes it clear that if these rules will not suffice to do substantial justice, it is within the discretion of the court to grant relief on such terms as justice requires. Compare Section 272, which makes this clear in cases of impracticability and frustration. PP. 381, 382 id.

4. *Mistake Defined*: A mistake is a belief that is not in accord with the facts. An erroneous belief as to the contents or effect of a writing that expresses the agreement, is ... a mistake. Section 151 id.

5. Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of a writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected. Rule 155, P. 406 id.

6. It may be a writing evidencing a contract within the Statute of Frauds, since the Statute does not bar reformation. See Section 156. (If neither the parol evidence rule nor the Statute of Frauds applies, the writing itself will not ordinarily have sufficient legal significance for its reformation to be necessary.) Rule 155 id. Comment a.

161

7. The error in expressing the agreement may consist in the omission or erroneous reduction to writing of a term agreed upon or the inclusion of a term not agreed upon. If the parties are mistaken with respect to the legal effect of the language that they have used, the writing may be reformed to reflect the intended effect. Rule 155 id. Comment a. [Underscoring ours.]

8. Reformation is not precluded by the mere fact that the party who seeks it failed to exercise reasonable care in reading the writing, but the right to reformation is subject to the rule on fault stated in Section 157. Rule 155 id. Comment a.

9. *Effect of Fault of Party Seeking Relief*: A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. Rule 157 id.

10. With the merger of law and equity under modern codes of procedure, it is generally unnecessary to seek reformation as a condition to enforcing the true contract, and a party may be granted both reformation and enforcement in a single suit. Rule 155 id. Comment a.

11. In reducing the agreement to writing, B's lawyer erroneously omits the provision of assumption, and neither A or B notices the omission. At the request of either A or B, the court will reform the writing to add the provision for assumption. Rule 155 id. Illustration 1. [Underscoring ours.]

In the first point argued in its brief, respondent cites the case of Pugh v. Holmes, 486 Pa. 272, 284, 405 A.2d 897, 903 (1979), for the proposition that a lease is a contract and is to be interpreted according to contract principles; and the cases of Robert F. Felte, Inc. v. White, 451 Pa. 137, 143, 302 A.2d 347, 351 (1973); and Unit Vending Corp. v. Lacas, 410 Pa. 614, 617, 190 A.2d 298, 300 (1963), in support of the legal principle that "[d]etermining the intention of the parties is a paramount consideration in the interpretation of any contract." The Court agrees, except we would say the determining of the intention of the parties is not just *a* paramount consideration, but *the* paramount consideration, and that is exactly what the Court has proceeded to do in the case sub judice.

162

Respondent also cites the cases of Steuart v. McChesney, 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982); and In re Estate of Breyer, 475 Pa. 108, 115, 379 A.2d 1305, 1309 (1977), in support of the contention "[t]hat the intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." But the factual bases of these cases are not analogous to the factual basis of the instant action; in neither of these cases, as in the instant action, was there a finding that there existed a mutual mistake in the contract executed by the parties, thus triggering the application of section 155 of the Restatement of Contracts, Second.

Next, the Respondent cites Reed, Wible and Brown, Inc. v. Mahogany Run Development Corporation, 550 F. Supp. 1095 (D.C.V.I. 1982), in which our own Judge David O'Brien stated that "[i]t is a basic tenet of contract law that the subjective intent of the parties to a contract is immaterial. They are bound only by their objective manifestation—in this case, the clear language of [the lease]." But we note that in support of that proposition, Judge O'Brien cites Judge Learned Hand's expression in the case of Hotchkiss v. National City Bank, 200 F. 287, 293 (S.D.N.Y. 1911), aff'd, 201 F. 664 (2nd Cir. 1911), aff'd, 231 U.S. 50, 34 S. Ct. 20, 58 L. Ed. 115 (1913), in these words:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. [Underscoring ours.]

It is of some significance to us that even way back then, before the origin of the Restatements in 1923, and certainly before its adoption as the rule of law in our jurisdiction in 1957, Judge Hand modified all his prior statement by the portion underscored by us, to wit: "unless there were some mutual mistake, or something else of the sort." That is precisely the factor which distinguishes that case and precludes it from being an appropriate analog of the case we are called upon to decide. And the rationale is sound. The paramount duty of the Court is to do justice between the parties. If the type of inflexibility of approach of the Court in the discharge of that

163

function which respondent would have us apply were the rule, with no exception whatsoever, there would be no need for the existence and application of the equitable doctrine of reformation. Regardless of how obvious it was made to the Court that a mistake had been made by the parties in reducing their agreement to writing, the parties would be without any remedy; the Court would be powerless to grant any relief whatsoever.

We therefore conclude that none of the authorities cited by respondent in point one of its brief support its contention that as long as the language used by the parties in the contract signed by them is clear and unambiguous, the Court may look only to that language in its efforts to determining the true intention of the parties, and therefore just how and what they are required to perform as a result of the language used by them. We further hold that even if any of these authorities may be reasonably construed to so hold, they would at best be instructive, not even persuasive, given the fact that we are required to follow the law as it appears in the Restatements, and such holding would be clearly contrary thereto.

■ Respondent next argues in point two of its brief that petitioner bears the risk of any mistake especially as petitioner hired the attorney who drew the lease, and therefore the contract is enforceable as written. Much of what we stated above may be appropriately restated here. This concept is governed by section 154 of the Restatement of Contracts, Second, which reads as follows:

> *When a Party Bears The Risk of a Mistake*: A party bears the risk of a mistake when
> (a) the risk is allocated to him by agreement of the parties, or
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Subdivision (a) of the section is inapplicable here as nowhere in the 1983 document in question is the risk of a mistake allocated to either party. Subdivision (b) is inapplicable as here the petitioner exercised due care in giving the correct instructions to his attorney, and it is by the inadvertence of the attorney that the mistake found its way into the executed document. In fact, as Attorney Campbell made clear in paragraph 9 of his affidavit of February 13, 1989,

164

and the written draft of the document he gave to his secretary from which the finished draft was typed, the error is a typographical one made by the secretary which he or either party failed to note before the finished document was signed. The draft as handwritten by him supports this statement which appears in his aforesaid affidavit, and, in pertinent part, reads as follows:

> In the event lessee herein elects to exercise shall [sic, should be such] option or options then and in that event the monthly rental installments, taxes and insurance shall not be increased more than 80% of the rentals, taxes and insurance then being paid during the last month of the regular term of this sublease agreement. In the event that the second option period is exercised, then the rental, taxes and insurance for said period shall not be more than 80% of the rentals, taxes and insurance then being paid during the last month of the first 5 year option period. In all other instances the terms and conditions of the sublease agreement (and the modification herein agreed to by the parties) shall apply to the two option periods.

We hold that it is precisely this type of situation to which items 1 (see *infra* p. 160) and 11 (see *infra* p. 162) hereof apply, and justify the granting of the relief of reformation of the contract, to express the true agreement and intention of the parties.

In point three of its brief respondent contends that "[t]he amended lease is an integrated agreement and the Court cannot consider parol evidence. But subdivision (1) of section 209 of the Restatement of Contracts, Second, provides that "[a]n integrated agreement is a writing or writings constituting a final expression of one or more terms of any agreement." The wording employed by the parties in this case and proved to the Court by the uncontroverted affidavit of the attorney who drafted it as not being a true representation of what they intended cannot reasonably, legally or especially equitably be elevated to the level of binding them, and therefore cannot be described as their final expression.

Subdivision (2) of the rule states "[w]hether there is an integrated agreement is to be determined by the Court as a question preliminary to determination of a question of interpretation or the application of the parol evidence rule." It would be a travesty of justice to characterize any agreement as integrated where, as here, it has been established that it fails to express the intention of the parties.

165

And as to subdivision (3) of section 209, which reads:

> Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression.

Since the Court is satisfied and has found that it has been established by other evidence, e.g., the drafting attorney's affidavit, that the writing is not a true and correct final expression of the parties, it cannot be legally treated and applied to the parties as an integrated agreement. In sum, no writing that does not truly express the intention of the parties can be fairly termed a final expression of the parties. No writing that is not a final expression of the parties can be correctly treated as an integrated agreement. And no writing which cannot be treated as an integrated agreement can be the subject of the application of the Parol Evidence Rule. Furthermore, even if the Parol Evidence Rule is applicable, we must note all it says:

> Under this rule, parol or extrinsic evidence is not admissible to add to, subtract from, vary or contradict judicial or official records or documents, or written instruments which dispose of property or are contractual in nature, and which are valid, complete, unambiguous and unaffected by accident or mistake. Wheeler, Kelly & Hagny Inv. Co. v. Curts, 158 Kan. 312, 147 P.2d 737, 740. [Underscoring ours.]

Note that even in writing the rule due consideration is given by the law to mistakes which are made by the parties, for both the law, and especially equity, is first and foremost concerned with doing justice to the parties. They are not treated by American jurisprudence as being what we know they are not—infallible.

And, finally, respondent argues in point four on page 17 of its brief that "[i]f the contract clause is found to be unconscionable, reliance by respondent makes enforcement of the original contract proper." It bases this argument on Comment (d), which it incorrectly cites as subsection (d) of section 153 of the Restatement of Contracts, Second, "Reliance by the other party may make enforcement of a contract proper although enforcement would otherwise be unconscionable. If the party has relied on the contract in some substantial way, avoidance may leave that reliance

uncompensated. In such a case, enforcement of the contract would not be unconscionable, even if it otherwise would be."

█ First, petitioner is not asking the Court for the remedy of avoidance of this contract which has been in force and effect from January 27, 1983, the principles governing which appear in Rule 153 of the Restatements, and which are based on a mistake of one instead of both parties. Voiding the contract at this point, over six years after it was entered into and performed as written, to July 31, 1988, would be inappropriate.[6] Instead, the position of the Court is that at this point in the performance of the contract, reformation is the only appropriate (equitable) remedy, for it is a well-known equitable principle that where money damages would afford an adequate remedy to the seeker of equitable relief, the relief granted would be limited to, and not extend beyond, such relief (at law). Reformation of the contract would afford just such a limited, adequate and justified relief. See item 2 (*infra*, p. 160–61).[7]

Secondly, the reliance of the other party is based on what obviously is a mutual mistake of both parties as we have noted earlier. The only reason why the instant action was commenced as late as it was, nearly six years after the date of the amendment in question, is because only then did the first five-year option become operative.

Thirdly, as may be noted from item 5 (see *infra*, p. 161), and Rule 155 of the Restatement of Contracts, Second, the granting of the equitable remedy of reformation is not affected by the extent to which the parties to the contract themselves are prejudiced, but "to the extent that the rights of third parties such as good faith purchasers for value will be unfairly affected." No such third parties have been mentioned to the Court.

---

[6] Note from paragraph 9 on page 3 of Attorney Campbell's affidavit of February 13, 1989, that the correct date of the amendment containing the mistake in question, which again both parties signed, is not January 27, 1982, as appears on the document, but January 27, 1983, which mutual mistake was probably made because of the close proximity of the time of signing the agreement to the change in the year. This is also clearly a second mutual mistake warranting reformation, and concerning which the contract is reformed by the Court.

[7] The Court is pleased to note that in addition to performance of the 1983 lease amendment as written from its inception to July 31, 1988, and in addition to the substantial sum of $162,000.00, which is the disputed sum for the first option period in which the parties are not operating, from July 31, 1988, to the present, in the words of respondent on page 15 of its brief: "International Motors has developed an extensive automobile business in Subbase."

## IV. CONCLUSION

Since there is no dispute relating to the language used in the 1983 lease amendment; since there has been presented to the Court the uncontroverted affidavit of the attorney who drafted the amendment that in fact a mistake of substance was made by his office in preparing the final draft of the amendment which was signed by the parties; since the rights of good faith third parties for value are not in question; and, finally, since the issue which arose was litigated with due diligence and dispatch, the Court will grant petitioner's motion for summary judgment, not of avoidance, but of reformation of the contract, to include the words omitted in the pertinent part of paragraph (6) of the Amendment to Lease Agreement of April 21, 1971, executed by the parties on January 27, 1983, so that it will read:

> In the event lessee International elects to exercise such option or options, then and in that event the increase in the monthly rental installments, taxes and insurance shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the regular term of the Sublease Agreements. In the event that the second option period is exercised by International, then the increase in the rentals, taxes and insurance for said period shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the first five (5) year option period.

█ Accordingly, respondent shall pay to petitioner that portion of the rent due and unpaid to date by reason of the contract as reformed by the Court, and as petitioner notifies the respondent in writing within thirty (30) days from the date hereof is the precise amount payable, not exceeding the total amount chargeable by petitioner; and respondent shall continue to pay said amount for the remainder of the first five-year option period, in which case, and on condition of payment of which rental amounts, respondent shall be entitled to continue to occupy the demised premises for the remainder of the first five-year option period.

Further, should respondent elect to exercise the second five-year option period, it shall give notice thereof to petitioner or its successor in interest not less than sixty (60) days prior to the expiration of the first five-year option period.

■ Each party will be ordered to pay its own attorney's fee and Court costs.

## DECREE

The Court having issued its Memorandum Opinion herein on even date herewith, and the Court having fully deliberated in the premises and being satisfied therein, it is hereby

ORDERED, ADJUDGED AND DECREED:

1. That the motion for summary judgment of petitioner granting reformation of the amendment executed by the parties on January 27, 1983, is granted, and the part of paragraph (6) of the document at issue is hereby reformed to read as follows:

> In the event lessee International elects to exercise such option or options, then and in that event the increase in the monthly rental installments, taxes and insurance shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the regular term of the Sublease Agreements. In the event that the second option period is exercised by International, then the increase in the rentals, taxes and insurance for said period shall not exceed 80% of the rentals, taxes and insurance then being paid by International during the last month of the first five (5) year option period.

2. That accordingly, respondent shall pay to petitioner that portion of the rent due and unpaid to date by reason of the terms of the contract as reformed by the Court, and as petitioner notifies the respondent in writing within thirty (30) days from the date hereof is the precise amount payable, not exceeding the total amount chargeable by petitioner; and respondent shall continue to pay said amount for the remainder of the first five-year option period, in which case, and on condition of payment of which rental amounts, respondent shall be entitled to continue to occupy the demised premises for the remainder of the first five-year option period.

3. Further, should respondent elect to exercise the second five-year option period, it shall give notice thereof to petitioner or its successor in interest not less than sixty (60) days prior to the expiration of the first five-year option period.

4. That the date the contract was signed by the parties is changed from January 27, 1982, to January 27, 1983.

5. That the motion for summary judgment of the respondent is hereby denied.

6. That each party shall pay its own attorney's fees and Court costs.